UNITED STATES

v.

**Robert T. STOMBAUGH, 570 77 3911 Aviation Machinist's Mate Airman Apprentice (E–2), U.S. Naval Reserve.**

**NMCM 92 0181.**

U.S. Navy–Marine Corps Court of Military Review.

Sentence Adjudged 20 Dec. 1990.

Decided 19 March 1993.

LT James A. Douglas, JAGC, USNR, Appellate Defense Counsel.

LT David K. Herlihy, JAGC, USNR, Appellate Government Counsel.

LCDR Lawrence W. Muschamp, JAGC, USN, Appellate Government Counsel.

Chuck R. Pardue, Civilian Defense Counsel.

Before D. LARSON, J., STRICKLAND, Senior Judge, and J. ORR, J.

STRICKLAND, Senior Judge:

The appellant was convicted by general court-martial, comprised of officer and enlisted members, of rape, burglary, unlawful entry, and indecent assault in violation of Articles 120, 129, and 134, Uniform Code of Military Justice (UCMJ), 10 U.S.C. §§ 920, 929, and 934, respectively. He was sentenced to a dishonorable discharge, confinement for 93 months, forfeiture of $680.00 pay per month for 93 months, and reduction to pay grade E–1. In response to clemency requests submitted on behalf of the appellant, the convening authority approved the adjudged sentence but suspended confinement and forfeitures in excess of 72 months.

Six assignments of error are raised on appeal.[1] We have carefully considered

---

1. I. WHETHER APPELLANT WAS PROPERLY CONVICTED EVEN THOUGH THERE WAS INSUFFICIENT EVIDENCE, APPLYING A BEYOND A REASONABLE DOUBT STANDARD, WITH WHICH TO FIND HIM GUILTY.
II. WHETHER FORCING PETITIONER TO LANGUISH IN CONFINEMENT, WITHOUT HOPE OR MEANS TO INITIATE APPELLATE

each assignment of error and have reviewed the record pursuant to Article 66, UCMJ, 10 U.S.C. § 866. We conclude that the assignments of error have no merit and that no prejudicial error was committed which affects the findings or sentence.

I

At approximately 0400 hours on 2 September 1990, a dependent wife, W, and a female Lieutenant Junior Grade C, were asleep in C's room at the Bachelor Officer Quarters (BOQ).[2] W was awakened by the closing of the front door and a male who lay down beside her with his face on her breasts. In response to W's inquiry as to who he was, the male replied that he was a new pilot in C's squadron and that C told him he could "crash" there. After a short discussion, during which W became initially convinced that the male was a pilot, W felt the male's hand moving toward her groin area and she got up, got dressed, and left the room. Thereafter, the male left the room and later returned and entered the bedroom where C slept. C testified that she was awakened by a male on top of her with his penis penetrating her vagina. She recognized this male as the appellant, an enlisted man in her squadron. C stated that she pushed the appellant away and told him to leave. The appellant complied.

The appellant asserted at trial and again on appeal that C had consented to the intercourse or, in the alternative, that he was honestly and reasonably mistaken in believing that she had consented. He testified that some 6 months previously, C had invited him to come to her room sometime and "party" and, having been locked out of his room at 0400, he decided to take her up on the invitation. He denied representing himself to W as an officer, placing his face on her breasts, or reaching for her groin area. The appellant further testified that when he entered C's bedroom she was lying naked on the bed and that she touched his wrist and then his shirt and belt. After removing his clothes and getting in bed with C, the appellant said that she assisted him in inserting his penis and reinserted his penis into her vagina when it slipped out. He further stated that she wrapped her legs around him and moved her body back and forth. However, the appellant testified that at some point he decided he did not want to do this and stopped, at which time C commented that this could ruin her career and he had better leave before they were seen together.

RELIEF PROCEDURES, FOR MORE THAN FOUR HUNDRED FIFTY DAYS WHILE THE GOVERNMENT DELAYED PRODUCING THE REQUESTED PERFECTED RECORD OF TRIAL UNFAIRLY PREJUDICED APPELLANT.

III. WHETHER ILLEGAL COMMAND INFLUENCE UNFAIRLY PREJUDICED APPELLANT'S TRIAL AND DEPRIVED APPELLANT OF A FAIR TRIAL.

IV. WHETHER A STATEMENT CREATED BY NAVAL INVESTIGATIVE SERVICE AGENTS WITH THE COOPERATION OF APPELLANT, LATER LABELLED "CONFESSION" BY THE GOVERNMENT, WAS IN FACT A VALID STATEMENT BY APPELLANT BECAUSE SUCH STATEMENT WAS OBTAINED AFTER DENIAL OF APPELLANT'S REQUEST FOR COUNSEL, AND WHETHER SUCH A QUESTIONABLE STATEMENT WAS ERRONEOUSLY ADMITTED INTO EVIDENCE.

V. WHETHER HARMFUL PREJUDICE ACCRUED TO APPELLANT WHEN THE TRIAL COURT DECLARED THAT A CLINICAL PSYCHOLOGIST WITH NO SPECIALIZED TRAINING IN MATTERS OF A SEXUAL NATURE, WHO WAS THE PROSECUTION'S MAIN SOURCE OF INFORMATION AND WHO CONDUCTED THE 706 BOARD AGAINST APPELLANT, CAN BE CONSIDERED AN ADEQUATE SUBSTITUTE EXPERT WITNESS FOR APPELLANT'S EXPERT OF CHOICE WHO HAD EXTENSIVE TRAINING IN SEX THERAPY, POST TRAUMATIC STRESS DISORDER, SLEEPING-RELATED ACTIVITY, THE EFFECTS OF ALCOHOL ON MEMORY AND RESPONSES, AND DEALING WITH VICTIMS OF SEXUAL ABUSE.

VI. WHETHER A SENTENCE THAT INCLUDES DISHONORABLE DISCHARGE, UNSUSPENDED CONFINEMENT FOR SEVENTH-TWO [sic] (72) MONTHS, REDUCTION IN RATE TO E-1, AND FORFEITURE OF $680.00 PER MONTH IS INAPPROPRIATELY SEVERE UNDER THE FACTS OF THIS CASE.

2. The room was actually a suite of two rooms with a living room in the front portion of the suite, just inside the front door, and a bedroom and bath in the rear of the suite, separated from the living room by a door.

In support of this defense, numerous character witnesses were called to testify as to the appellant's character for peacefulness and for being truthful, while C was portrayed as having a reputation for drinking to intoxication and for being promiscuous. One of the character witnesses, Lieutenant Gonzalez, testified that he was told by fellow junior officers in the squadron that he should not testify for the appellant and against the victim. Another character witness, a petty officer, asserts in an affidavit that his division officer told him not to get involved and that he was verbally harassed by two other officers when they learned he was going to testify for the appellant.

## II

■ The appellant asserts that the Government delay in forwarding the record of trial for review has resulted in unfair prejudice and that the charges should therefore be dismissed. The standard of review on appeal is whether the appellant has met his burden to demonstrate that he was actually prejudiced by this delay. *United States v. Banks*, 7 M.J. 92 (C.M.A.1979).

The appellant was sentenced on 20 December 1990. The record of trial was thereafter transcribed in a timely fashion and was authenticated by the military judge on 8 March 1991. Trial defense counsel, however, found what he believed were major deficiencies in the transcription and moved for a certificate of correction on 8 April 1991. The convening authority agreed, and the entire record was transcribed again resulting in a "corrected" copy. The "corrected" copy was authenticated by the military judge on 13 August 1991, and the convening authority took action on 27 December 1991. The case was received by the Navy–Marine Corps Appellate Review Activity on 24 January 1992.

In support of this assignment of error, the appellant asserts that he was prejudiced by being unable to timely present defense submissions to the convening authority pursuant to Rule for Courts–Martial (R.C.M.) 1105, that he was unable to qualify for parole consideration, and that

he was unable to initiate an appeal under Articles 66 and 67, UCMJ, 10 U.S.C. §§ 866 and 867. The Government submitted an affidavit explaining the reasons for the post-trial delay in this case and takes the position that no specific prejudice has occurred.

■ In *Banks*, the Court of Military Appeals overturned the inflexible rule established in *Dunlap v. Convening Authority*, 23 C.M.A. 135, 48 C.M.R. 751 (1974), that charges would be dismissed in any case where the accused was confined and the convening authority did not take action in the case within 90 days. In its place, the Court instituted the test that the "delay of final action by the convening authority will be tested for prejudice." *Banks* at 94. This test was reiterated in *United States v. Clevidence*, 14 M.J. 17 (C.M.A.1982), with the added caveat that the Court would be reluctant to dismiss charges as a remedy in a case involving serious offenses. The prejudice must be verified or verifiable, and the burden to demonstrate prejudice rests with the appellant. *United States v. Dunbar*, 31 M.J. 70 (C.M.A.1990).

■ In this case, the appellant first claims that he was unable to timely submit R.C.M. 1105 matters to the convening authority who had the power to grant him relief. The fact of the matter is, the appellant ultimately did submit R.C.M. 1105 material, and the convening authority granted him sentence relief by suspending 21 months of the appellant's sentence to confinement. The fact that the convening authority might have been able to suspend this confinement sooner would not have benefited the appellant in any way since the approved period of unsuspended confinement was 72 months.

Secondly, the appellant claims that he was unable to qualify for consideration for parole because the Government violated its own regulations by failing to forward a copy of the record of trial and the convening authority's action to the Naval Clemency and Parole Board within 9 months after the sentence began to run. Thus, he argues the board was unable to timely consider his case when he was an excellent

candidate for clemency. The Government has filed evidence in the record that the Naval Clemency and Parole Board considered the appellant's case on 9 April 1992, and the board decided against granting clemency. We have no problem concluding that if the board failed to grant clemency for the appellant after he was incarcerated for nearly 16 months, they would not have done so any sooner, at a time when even less confinement had been served.

Finally, the appellant contends that he was precluded from being able to initiate his appeal in this Court as well as the Court of Military Appeals. Had we found merit in his appeal resulting in either a dismissal of the findings and sentence or the affirmance of a sentence less than time already served, the appellant might be able to demonstrate prejudice. Since we find no merit in his appeal, the appellant has failed to so demonstrate. Should he later be able to convince the Court of Military Appeals that prejudice has occurred, we are confident that an appropriate remedy will be fashioned at that time.

We conclude that the appellant has failed to meet his burden to verify the existence of actual prejudice in this case occasioned by the lengthy delay in executing the convening authority's action. In so holding, we in no way condone this excessive delay. Although some of the delay appears to be justified, the overall delay is not.

### III

■ The appellant contends that unlawful command influence, both apparent and actual, was exercised in his case depriving him of a fair trial. The standard of review on appeal is a three-part test. First, did the defense, at trial or on appeal, present some evidence from which to draw a reasonable conclusion in favor of the allegation of command influence? Second, if the issue of command influence is reasonably raised, did the Government meet its burden to prove by clear and positive evidence that command influence did not occur? Third, if the Government failed to meet its burden, and there is a finding that command influence existed, can this Court be satisfied that the findings and sentence are unaffected by the command influence beyond a reasonable doubt? *United States v. Jones*, 30 M.J. 849, 854 (N.M.C.M.R. 1990).

Although the defense never formally sought a remedy at trial based on unlawful command influence, some evidence on this issue was received at trial, and some evidence has been accepted on appeal. During the defense case in chief on the merits, Lieutenant Gonzalez was called as a witness. Lieutenant Gonzalez was the appellant's Branch Officer, and he testified that the appellant was hard-working and diligent; had a reputation for being honest to a fault; and had a reputation as being nonaggressive. He further testified that the victim, C, had a reputation for being promiscuous and for being a drinker. He also indicated that he was personally aware of one instance where C appeared to have had an alcoholic blackout as to events occurring the previous evening. The lieutenant's credibility was severely attacked by the trial counsel on cross-examination with reference to two convictions before entering the naval service and some alleged deficiencies in flight performance. Thus, in redirect, the defense counsel attempted to counter this credibility attack by demonstrating that the lieutenant was testifying despite pressure from his peers to keep quiet and despite animosity from his peers due to his involvement in the appellant's court-martial. The following colloquy occurred:

Q. How many people have given you some flack concerning testifying with respect to this court-martial?

A. A large amount of people, sir.

Q. And, is that officers?

A. Yes, sir.

Q. You've been criticized about testifying?

A. Yes, sir, I have.

Q. You've felt some pressure from these officers?

A. Yes, sir. There's something called JOPA, and I'm not playing by the rules of JOPA.

Q. Could you explain what JOPA is?

....

A. JOPA is the junior Officer Protection Association. That's common in all aviation squadrons. Basically, it's "What Dad doesn't know, won't hurt him, and JO's stick together, basically, regardless of the cost." When this incident started, the Commanding Officer said to me, "You are Airman Stombaugh's Branch Officer. You are responsible for his well-being throughout these proceedings." I said, "Yes, sir," and I started doing that....

....

Q. Is there anything else that you want to answer concerning JOPA or dislike in the Squadron?

A. Yes, sir. Within the Squadron members, since I started doing what I've been told to do, to look out for Airman Stombaugh and make sure he was getting his checks, that he access [sic] to his personal property, etcetera, a couple of the officers in the wardroom started asking me what my involvement was. I told them, "I'm his Branch Officer, I'm supposed to look out for him. I'm doing my job." When it became known that I had talked to Captain Lizzul, and I was going to testify, a couple people reminded me that JOPA existed, and that C ... was an officer, and that Stombaugh was an enlisted man. I really didn't the hint [sic]. I just kind of went, "Yeah, right whatever. Whoever you are, doesn't change what happened." Before the Article 32 hearing occurred, in fact, the morning I was called into it, a couple of the officers cornered me in the locker room....[3]

Record at 1083–1085.

Examination continued by the military judge and the following colloquy ensued:

Q. Being as specific as you can, why are the Squadron officers giving you a hard time about testifying at this court-martial?

A. Well sir, from what was said to me, it was that, as junior officers, it was none of our business as to what had occurred, and that no one would ever really know what occurred in that room that night, and that, therefore, I should basically shut up and tow the line, is the way I interpreted what I was told; and that was basically it. And, I've been told more than once, by more than one individual, that, "You're pissing us off," and, "We think you're out to get Spike," or that, "Either advertently, or inadvertently, your testimony is hurting Spike. Whether or not it has anything to do with the case, it's physically hurting her."[4]

Record at 1101.

In addition to the foregoing evidence received at trial, this Court accepted a post-trial affidavit from John Brian Trickel, a petty officer who had favorably testified at trial as to the appellant's character for truthfulness and who testified adversely as to the reputation of C. In this affidavit, Petty Officer Trickel states that when the trial began he informed his Division Officer, Lieutenant Denz, that he was going to testify, and his Division Officer told him not to get involved. He further states that during the trial he was verbally harassed by Warrant Officer Quillian and Lieutenant Commander Hensel. Finally, he states that he asked that the courtroom be cleared prior to his testimony because one of the squadron officers he flew with was present, and he feared that the substance of his testimony would be repeated within the squadron resulting in further harassment.[5]

The Government has offered no counter-affidavits to rebut the testimony of Lieutenant Gonzalez or the affidavit of Petty Officer Trickel. Instead, the Government

3. Captain Lizzul was the appellant's detailed defense counsel at trial.

4. Spike was a nickname for the victim, C.

5. We note that neither the original record or the "corrected copy" reflect that any spectators were removed from the proceeding or that the judge ordered a closed session. This is a significant event in what otherwise is required to be a public trial, see Rule for Courts–Martial 806, and this event should be reflected in the record of trial.

takes the position that this evidence could not constitute command influence because command influence involves action by commanders, action taken at their behest, or action in furtherance of command goals and policies. JOPA, the Government reasons, was simply a rogue organization, and the actions of this organization and the officers who dealt with Petty Officer Trickel were not sanctioned by the command. We do not agree with this position, and it is contrary to the law.

■ The question of whether personnel other than the convening authority can engage in unlawful command influence was answered in *United States v. Levite*, 25 M.J. 334 (C.M.A.1987) (officer and enlisted members of the command attempting to influence or prevent testimony favorable to the accused). The Court stated, "The plain language of Article 37, its legislative history, and our previous decisions applying it have included such persons within its purview." *Levite*, 25 M.J. at 338, 339. (footnotes omitted). Consequently, the Court held that the actions of command personnel constituted unlawful command influence in violation of Article 37, UCMJ, 10 U.S.C. § 837. *Accord United States v. Hilow*, 32 M.J. 439 (C.M.A.1991) (Article 37 applies to command subordinates and thus to the actions of the division deputy adjutant general in nominating members for court-martial who were supporters of hard discipline).

■ In this case numerous command subordinates, even a Division Officer within in the chain of command, participated in the intimidation and the harassment of both Lieutenant Gonzalez and Petty Officer Trickel.[6] We conclude that these actions were undertaken with the clear intent of preventing these witnesses from testifying in a manner favorable to the appellant and adverse to the victim, C. As a result, we further conclude that the issue of command influence has been reasonably raised by the defense, both at the trial level and on appeal. The Government has failed to meet its burden to rebut the evidence of command influence by clear and positive evidence. Accordingly, we hold that the actions of the officers of appellant's command directed toward Lieutenant Gonzalez and Petty Officer Trickel constituted unlawful command influence.

■ The only remaining question is whether this unlawful command influence affected the findings or sentence. We note that there is no evidence in the record that even suggests that any command influence existed with respect to any other aspect of this case except as it relates to the testimony of Lieutenant Gonzalez and Petty Officer Trickel. These two witnesses only testified on the merits; not during the sentencing phase of the trial. Thus, we must only assess the impact, if any, of the unlawful influence on the findings.

■ Both of the witnesses testified fully for the appellant despite the unlawful command influence exerted upon them. It is clear from Lieutenant Gonzalez's testimony that he had intended all along to testify, and that he as much as told this to his tormentors. He considered it his duty to do so, and he simply felt this was part of taking care of the appellant as he was ordered to do by his commanding officer. Both of these witnesses testified at the Article 32 proceeding, and their trial testimony is consistent with that given at the Article 32, even though much of the intimidation and harassment occurred between the time of the Article 32 and the time of trial. In addition, their testimony was consistent with all other defense witnesses who testified as to the character of the appellant and that of the victim. Finally, their testimony was very beneficial to the appellant's position that the allegations were out of character and that he was a truthful person. Their testimony as to certain character flaws in C and her contact with enlisted personnel also benefited the appellant by advancing his position that C consented to sexual intercourse. Thus, we are not faced with a situation where potential witnesses were deterred by command

---

**6.** The irony of this situation is that the appellant's commanding officer was motivated to protect the interests of the appellant from the outset, and the actions of his subordinate officers appears to be completely contrary to the commanding officer's desires.

influence from expressing their candid opinions, *see United States v. Jones*, 30 M.J. 849 (N.M.C.M.R.1990), or a situation where the witness' trial testimony appeared to be less favorable than it had been earlier on in the case prior to the existence of the command influence. *See United States v. Hall*, 36 M.J. 1043 (N.M.C.M.R. 1993).

We have carefully considered the entire record and, in particular, the testimony of Lieutenant Gonzalez and Petty Officer Trickel and have concluded that their testimony would not have been any different, even in the absence of unlawful command influence. Having so concluded, we are convinced beyond a reasonable doubt that the unlawful command influence in this case did not affect either the findings or the sentence.

### IV

The appellant alleges that the military judge erred in finding Dr. Bory to be an adequate substitute expert witness for Dr. Golden, the defense requested expert of choice. The appellant argues that Dr. Bory was not as qualified as Dr. Golden and that he was also anticipated as a Government witness. The latter argument was effectively mooted by the military judge's ruling that Dr. Bory could not be a prosecution witness and, at the same time, be an adequate substitute for Dr. Golden. The Government did not call Dr. Bory, and the appellant's argument on this point is without merit.

 As to the allegation that Dr. Golden was more qualified to testify than Dr. Bory, this Court has held that an "adequate substitute" for an expert is a witness possessing similar qualifications and who is willing to testify to the same opinions and conclusions. *United States v. Robinson*, 24 M.J. 649, 652 (N.M.C.M.R.1987). Dr. Golden is a clinical social worker with a Masters Degree in Social Work with extensive experience as a sexual therapist. The defense proffered that she would testify concerning human sexual response during sleep and during alcohol induced sleep. The defense believed that her testimony would support the alternate theory that if there was not actual consent in this case, the appellant made an honest and reasonable mistake that the victim consented due to various actions on her part while asleep. Dr. Bory is a clinical psychologist and a Navy Lieutenant Commander who was stationed at the Branch Naval Hospital in Sigonella as the head of the mental health department. While not practicing or studying in the area of sexual response during sleep, Dr. Bory had read extensively in this area. The military judge, without Government objection, qualified Dr. Bory as an expert witness in psychology generally, and in the area of sleep and sexual response during sleep. In addition, he was qualified by the military judge as an expert in the area of alcohol and its relation to sleep. Record at 1133, 1134.

The apparent difference in qualifications between Dr. Golden and Dr. Bory relate to the actual research and practice in the area of human sexual response on the part of Dr. Golden as opposed to extensive study in this area on the part of Dr. Bory. First, it is important to note that the expert was not called upon to examine or treat any individual involved in this case. The expert was only needed to render opinions based on hypothetical questions posed by the parties. Second, and equally important, is the fact that developing opinion evidence in this area did not involve a "battle of the experts," pitting the Government expert against the expert for the defense. In this instance, the military judge qualified Dr. Bory as an expert and his expertise was not challenged. Consequently, we conclude that under the circumstances of this case, the substitute expert possessed similar professional qualifications as the requested expert.

The remaining issue is whether Dr. Bory testified to the same opinions and conclusions as Dr. Golden was willing to testify to according to the proffer. We have carefully considered the proffer of the expected testimony of Dr. Golden and the trial testimony of Dr. Bory, and we have concluded the opinions and conclusions expressed at trial were virtually identical to those con-

tained in Dr. Golden's proffer. Accordingly, we conclude that Dr. Bory was an adequate substitute for Dr. Golden, and we hold that the military judge did not err in reaching the same conclusion.

## V

We have carefully considered the remaining assignments of error and find them to be without merit. Although this was a sharply contested case, we find the evidence of appellant's guilt to be overwhelming, and we are specifically convinced beyond a reasonable doubt of the appellant's guilt of the offenses of which he was convicted. *United States v. Turner,* 25 M.J. 324 (C.M.A.1987). In addition, under all of the facts and circumstances of this case, we conclude that the sentence, as adjudged and partially suspended by the convening authority, is appropriate. Accordingly, the findings and sentence, as approved on review below, are affirmed.