UNITED STATES, Appellee

v.

Robert T. STOMBAUGH, Aviation Machinist's Mate Airman Apprentice, U.S. Navy, Appellant.

No. 93–0810.
CMR No. 92 0181.

U.S. Court of Military Appeals.

Argued April 19, 1994.

Decided Sept. 15, 1994.

For Appellant: Chuck R. Pardue (argued); Lieutenant James A. Douglas, JAGC, USNR (on brief).

For Appellee: Lieutenant D.K. Herlihy, JAGC, USNR (argued); Colonel T. G. Hess, USMC, Commander S. A. Stallings, JAGC, USN, Lieutenant Commander Lawrence W. Muschamp, JAGC, USN, Major Laura L. Scudder, USMC (on brief).

*Opinion of the Court*

CRAWFORD, Judge:

Contrary to his pleas, appellant was convicted of rape of C, a female junior grade officer; indecent assault on W, a dependent wife; and burglary and unlawful entry of C's room at the bachelor officers quarters (BOQ), all on September 2, 1990, in violation of Articles 120, 134, and 129, Uniform Code of Military Justice, 10 USC §§ 920, 934, and 929, respectively. Appellant was sentenced to a dishonorable discharge, 93 months' confinement, partial forfeitures, and reduction to the lowest enlisted grade. The convening authority approved the sentence but suspended all confinement and forfeitures in excess of 72 months. The Court of Military Review affirmed the findings and sentence. 36 MJ 1180 (1993). We granted review of the following issue:

WHETHER APPELLANT'S COURT-MARTIAL WAS UNFAIR AND PREJUDICIAL DUE TO COMMAND INFLUENCE.

We hold that appellant's trial was not unfairly prejudiced by unlawful command influence.

## FACTS

The following facts were set forth by the Court of Military Review:

W was awakened by the closing of the front door and a male who lay down beside her with his face on her breasts. In response to W's inquiry as to who he was, the male replied that he was a new pilot in C's squadron and that C told him he could "crash" there. After a short discussion, during which W became initially convinced that the male was a pilot, W felt the male's hand moving toward her groin area and she got up, got dressed, and left the room. Thereafter, the male left the room and later returned and entered the bedroom where C slept. C testified that she was awakened by a male on top of her with his penis penetrating her vagina. She recognized this male as the appellant, an enlisted man in her squadron. C stated that she pushed the appellant away and told him to leave. The appellant complied.

The appellant asserted at trial and again on appeal that C had consented to the intercourse or, in the alternative, that he was honestly and reasonably mistaken in believing that she had consented. He testified that some 6 months previously, C had invited him to come to her room sometime and "party" and, having been locked out of his room at 0400, he decided to take her up on the invitation. He denied representing himself to W as an officer, placing his face on her breasts, or reaching for her groin area. The appellant further testified that when he entered C's bedroom she was lying naked on the bed and that she touched his wrist and then his shirt and belt. After removing his clothes and getting in bed with C, the appellant said that she assisted him in inserting his penis and reinserted his penis into her vagina when it slipped out. He further stated that she wrapped her legs around him and moved her body back and forth. However, the appellant testified that at some point he

decided he did not want to do this and stopped, at which time C commented that this could ruin her career and he had better leave before they were seen together.

In support of this defense, numerous [more than 10] character witnesses were called to testify as to the appellant's character for peacefulness and for being truthful, while C was portrayed [by 5 witnesses] as having a reputation for drinking to intoxication and for being promiscuous. One of the character witnesses, Lieutenant Gonzalez, testified that he was told by fellow junior officers in the squadron that he should not testify for the appellant and against the victim. Another character witness, a petty officer, asserts in an affidavit that his division officer told him not to get involved and that he was verbally harassed by two other officers when they learned he was going to testify for the appellant.

36 MJ at 1182–83.

Without a prosecution objection, appellant testified[1] that C was known for being "loose." In fact, some were referring to her as a "whore," but he thought "loose" sounded better. The judge allowed a number of witnesses to testify that C had a reputation for sleeping around with "this person or that person." They also introduced evidence that she showed up on the flight line with alcohol on her breath.

## DISCUSSION

The Court of Military Review held that the actions directed against Lieutenant Gonzalez and Petty Officer Trickel "constituted unlawful command influence," but the court was "convinced beyond a reasonable doubt that the unlawful command influence in this case did not affect either the findings or sentence." 36 MJ at 1186, 1187.

We will now address (A) Command Influence; (B) Interference with Access to Witnesses; and (C) Burdens of Production and Proof in that order.

### (A) Command Influence

■ The initial question is whether the witness interference alleged by appellant constituted "command influence." Article 37(a), UCMJ, 10 USC § 837(a)—Unlawfully influencing action of court—provides:

No authority convening a general, special, or summary court-martial, nor any other commanding officer, may censure, reprimand, or admonish the court or any member, military judge, or counsel thereof, with respect to the findings or sentence adjudged by the court, or with respect to any other exercise of its or his functions in the conduct of the proceeding. No person subject to this chapter may attempt to coerce or, by any unauthorized means, influence the action of a court-martial or any other military tribunal or any member thereof, in reaching the findings or sentence in any case, or the action of any convening, approving, or reviewing authority with respect to his judicial acts.

■ The first sentence indicates, "No authority convening a . . . court-martial . . . nor any other commanding officer . . . may censure, reprimand, or admonish the court or any member. . . ." It is the second sentence of Article 37(a) that is involved in this case: "No person subject to this chapter may at-

1. The record of trial in this case as submitted to the Court consists of VIII volumes. However, for example, Volume IV consists of trial pages 1001–1325, while Volume VIII consists of trial pages 900–1359. The action is in Volume IV. The exhibits are in Volumes IV and V. There was no mistrial or rehearing involved herein. It has been discovered that Volumes II–IV consist of the version of the record authenticated on March 8, 1991, while Volumes VI–VIII consist of the version of the record authenticated on August 13, 1991, but the March authentication page and the Certificate of Correction for pages 1–1359 both appear in Volume IV. There is no index to the witnesses in Volumes VI–VIII. All of this has created an administrative burden for the Court which should have been avoided by removing entirely the version of the trial in Volumes II–IV because it was not the correct version. The final corrected authenticated version of the trial is in Volumes VI–VIII. That is the only appropriate version for review by the convening authority, the court below, and this Court. The other version should have been destroyed. The exhibits should have been moved to their proper place in the final version. We are at a loss to understand why this situation was not alleviated before the record was transmitted to this Court. We expect closer attention to be paid to such matters.

tempt to coerce or, by any unauthorized means, influence the action of a court-martial. . . ." It goes without saying that a violation of Article 37 does not automatically amount to unlawful command influence. Likewise, discrepancy in rank between the party seeking to influence and the person whom he or she seeks to influence is not, in and of itself, the determinative factor in assessing whether the unlawful interference was indeed unlawful command influence. While the influence may well be unlawful and its effect just as harmful, there is a distinction between influence that is private in nature and influence that carries with it the mantle of official command authority. The threshold question here is whether, under the facts of this case, appellant's allegations of a violation of this second sentence as to two defense witnesses constitute unlawful command influence or whether the allegations are more accurately styled as unlawful interference with an action of a court.

Our vigilance in combatting unlawful command influence is well recognized. In *Weiss v. United States,* —— U.S. ——, ——–––——, 114 S.Ct. 752, 762–63, 127 L.Ed.2d 1 (1994), the Supreme Court asserted:

> The entire system, finally, is overseen by the Court of Military Appeals, which is composed entirely of civilian judges who serve for fixed terms of 15 years. That Court has demonstrated its vigilance in checking any attempts to exert improper influence over military judges. In *United States v. Mabe,* 33 MJ 200 (1991), for example, the Court considered whether the Judge Advocate General of the Navy, or his designee, could rate a military judge based on the appropriateness of the judge's sentences at courts-martial. As the Court later described: "We held [in *Mabe* ] that the existence of such a power in these military officers was inconsistent with Congress' establishment of the military 'judge' in Article 26 and its exercise violated Article 37 of the Code." [*United States v.*] *Graf,* 35 M.J. [450] at 465 [(CMA 1992) ]. And in *Graf,* the Court held that it would also violate Articles 26 and 37 if a Judge Advocate General decertified or transferred a military judge based on the

General's opinion of the appropriateness of the judge's findings and sentence.

Since the 1950s until the present, we have condemned many instances of unlawful command influence, including unlawful influence of court members: *United States v. Kitts,* 23 MJ 105, 108 (CMA 1986) (staff judge advocate briefing court members prior to pending court-martial); *United States v. Zagar,* 5 USCMA 410, 18 CMR 34 (1955) (Court condemned impropriety of lecture by a colonel to court members); *United States v. Hunter,* 3 USCMA 497, 13 CMR 53 (1953) (convening authority at a pretrial conference discussing prior derelictions of the accused with at least three court members and telling them of light sentences in prior cases); direction to try specific class of defendants by general court-martial: *United States v. Hawthorne,* 7 USCMA 293, 22 CMR 83 (1956) (commanding general directed trial by general court-martial of all Regular Army soldiers with two prior admissible convictions); criticizing adjudged sentences in previous cases: *United States v. Littrice,* 3 USCMA 487, 13 CMR 43 (1953) (acting group commander criticizing sentences); and commanders discouraging witnesses from testifying: *United States v. Dykes,* 38 MJ 270 (CMA 1993); *United States v. Thomas,* 22 MJ 388 (CMA 1986), *cert. denied,* 479 U.S. 1085, 107 S.Ct. 1289, 94 L.Ed.2d 146 (1989). In each of these cases we looked at the interference with the substantial rights of the accused. It was not until *United States v. Thomas, supra* at 394, that we enunciated the test that the appellate courts must be "persuaded beyond a reasonable doubt that the findings and sentence have not been affected by the command influence."

Each of the unlawful-command-influence cases has involved some mantle of command authority in the alleged unlawful activity. The actors have been convening authorities, commanders, and staff judge advocates. When the officiality of command has been established, we have applied a very stringent standard and burden on the Government.

**(B) Interference with Access to Witnesses**

■ The protection of the United States Constitution and Federal laws apply to mem-

bers of the armed forces "except those [protections] which are expressly or by necessary implication inapplicable," *United States v. Jacoby,* 11 USCMA 428, 430–31, 29 CMR 244, 246–47 (1960). Applicable protections include the fundamental right to a fair trial, *Estelle v. Williams,* 425 U.S. 501, 96 S.Ct. 1691, 48 L.Ed.2d 126 (1976); and the Sixth Amendment right to compulsory process, and the right to confront and to cross-examine witnesses. *See also* Art. 46, UCMJ, 10 USC § 846.

As Chief Judge Sullivan stated in *United States v. Williams,* 37 MJ 352, 359 (CMA 1993): "The Court unequivocally adopted the Supreme Court's holding that, where evidence is relevant, material, and favorable to the defense, such evidence 'is constitutionally required to be admitted.'" From the accused's viewpoint these rights are most critical and epitomize the underpinnings of the adversary system. We have been diligent to ensure that nothing undermines the fairness of the factfinding process in the military criminal justice system.

■ Here the defense alleges that one witness and one potential witness were told by individuals in the squadron not to testify for appellant and against the victim. A parallel may be drawn between this case and the cases from the Supreme Court discussing government interference with the access to witnesses. The standard of review on appeal is whether the defendant can make "a plausible showing" that the testimony of the absent witnesses would have been "material and favorable to his defense" and was not merely cumulative to the testimony of available witnesses. *See United States v. Valenzuela–Bernal,* 458 U.S. 858, 867, 102 S.Ct. 3440, 3446, 73 L.Ed.2d 1193 (1982).

Valenzuela–Bernal was charged with transporting an illegal alien into the United States in violation of 8 USC § 1324(a)(2). He moved to dismiss the indictment, claiming that the Government had deported two of the passengers in the car he was driving, thus violating his rights to due process and "to compulsory process for obtaining favorable witnesses." 458 U.S. at 861, 102 S.Ct. at 3443. The Supreme Court held there was no

violation of the right to compulsory process. "[T]o establish a violation of the right" to compulsory process more must be shown than "the mere absence" of witnesses. *Id.* at 867, 102 S.Ct. at 3446, *citing Washington v. Texas,* 388 U.S. 14, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967), where the "Court found a violation of this Clause of the Sixth Amendment when the defendant was arbitrarily deprived of 'testimony [that] would have been *relevant* and *material,* and ... *vital* to the defense.' 388 U.S. at 16 [87 S.Ct. at 1921] (emphasis added)." The Court in *Valenzuela–Bernal* continued, "He [the defendant] must at least make some plausible showing of how their testimony would have been both material and favorable to his defense." 458 U.S. at 867, 102 S.Ct. at 3446.

■ In *Webb v. Texas,* 409 U.S. 95, 93 S.Ct. 351, 34 L.Ed.2d 330 (1972), "the trial judge, on his own initiative," warned defendant's sole witness, who had an extensive criminal record, that he could "get into real trouble" if he lied and his testimony would be "personally" brought to the attention of the grand jury by the judge. After hearing these remarks, the witness refused to give any testimony. *Id.* at 96, 93 S.Ct. at 352. In *Webb,* the Supreme Court found a violation of the right to a fair trial when the action of judge effectively drove the witness off the witness stand. *Id.* at 97–98, 93 S.Ct. at 353–354. The attempted interference with witnesses by individuals with no mantle of command authority as described earlier is not command influence but interference with the access to witnesses.

Applying the foregoing discussion of unlawful command influence and interference with access to witnesses to the facts of appellant's case, we note that the mantle of command authority is lacking from the allegation of interference with at least one of the two defense witnesses. Lieutenant Gonzalez described the individuals who talked to him as part of JOPA (Junior Officer Protection Association). He testified that this type of organization is "common" to "all aviation squadrons" and stands for "What Dad doesn't know won't hurt him, and JO's [jun-

ior officers] stick together, basically, regardless of the cost." JOPA is neither a command nor an officially sponsored organization.

Indeed, LT Gonzalez' testimony indicates that he knew these officers did not represent the command. As the Government argues, it was common knowledge that JOPAs were "rogue organization[s] with goals directly contrary to good order and discipline." Answer at 7. Thus there is no showing that any of the individuals seeking to influence the testimony of LT Gonzalez did so with the mantle of command authority. While such an allegation of unlawful interference, if true, would certainly constitute a violation of Article 37(a), it would more properly be styled as unlawful interference with access to witnesses rather than unlawful command influence.

■ The question with regard to appellant's second witness, Petty Officer Trickel, is admittedly a closer call. Trickel submitted a post-trial affidavit in which he stated that, during appellant's trial, he was "harassed" by Lieutenant Commander (LCDR) Hensel, an aircraft pilot who had flown with the victim, and Warrant Officer Quillian. Petty Officer Trickel also stated that he was told by his Division Officer, LT Denz, "not to get involved" with appellant's trial. There is no showing that any of the individuals seeking to influence Petty Officer Trickel did so with the mantle of command authority. Indeed it appears from Trickel's affidavit that LCDR Hensel, the highest ranking individual, was motivated by private rather than command concerns. Yet the disparity in rank and the position of the witness' Division Officer in the chain of command is troubling. Under these circumstances we agree with the court below and conclude that the attempts to discourage Petty Officer Trickel from testifying, especially by his Division Officer, can fairly be construed as unlawful command influence. As a practical matter, a determination of whether the interference with appellant's two witnesses was unlawful command influence or unlawful interference with access to wit-

nesses makes no difference in the resolution of the granted issue.

(C) Burdens of Production and Proof

■ Whether the allegation is one of unlawful command influence or unlawful interference with access to a witness, the burden of production is on the party raising the issue.[2] As we indicated in *United States v. Allen*, 33 MJ 209, 212 (1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 1473, 117 L.Ed.2d 617 (1992):

> [T]here must be something more than an appearance of evil to justify action by an appellate court in a particular case. "Proof of [command influence] in the air, so to speak, will not do." We will not presume that a military judge has been influenced simply by the proximity of events which give the appearance of command influence in the absence of a connection to the result of a particular trial. *United States v. Thomas*, 22 MJ 388, 396 (CMA 1986), *cert. denied*, 479 U.S. 1085, 107 S.Ct. 1289, 94 L.Ed.2d 146 (1987); *see also United States v. Levite*, 25 MJ 334, 341 (CMA 1987) (Cox, J., concurring).

We also opined in *United States v. Johnston*, 39 MJ 242, 244 (CMA 1994): "We believe that the threshold triggering further inquiry should be low, but it must be more than a bare allegation or mere speculation." *See also* RCM 905(c)(2)(A), Manual for Courts–Martial, United States, 1984.

■ As Judge Cox stated in his concurring opinion in *United States v. Levite*, 25 MJ at 341, an appellant must (1) "allege[ ] sufficient facts which, if true, constitute unlawful command influence"; (2) show that the proceedings were unfair; and (3) show that the unlawful command influence was the proximate cause of that unfairness. We adopt this test. The same three-pronged analysis would apply to an allegation of unlawful interference with access to witnesses.

■ Once an appellant has met the burden of production and proof, the burden then

---

2. Normally the burden of production is upon the moving party. RCM 905(c)(2)(A), Manual for Courts–Martial, United States, 1984. An exception to this is when the evidence is within the exclusive control of the Government. This exception does not apply here.

shifts to the Government. As to the burden of proof, RCM 905(c)(1) provides: "Unless otherwise provided in this Manual, the burden of proof on any factual issue the resolution of which is necessary to decide a motion shall be by a preponderance of the evidence." As we mentioned earlier, in *Thomas* we created an exception to this burden of proof in cases of unlawful command influence. There we enunciated for the first time that the test for a judge and an appellate court is that it must be "persuaded beyond a reasonable doubt that the findings and sentence have not been affected by the command influence." 22 MJ at 394. Cf. *United States v. Wright*, 17 USCMA 110, 113, 37 CMR 374, 377 (CMA 1967) ("On this record, we are not convinced that the sentence indicates a degree of leniency demonstrating complete disregard of the influence of the lecture.").

## CONCLUSION

 Appellant has presented evidence, unrebutted by the Government, that LT Gonzalez and Petty Officer Trickel were unlawfully approached by others in violation of Article 37(a) in an attempt to influence them not to testify on appellant's behalf. In the case of Petty Officer Trickel, this violation amounted to unlawful command influence. Thus appellant has met his burden of production and proof for the first prong of the three-pronged *Levite* analysis. Regardless of our characterization of the unlawful influence directed at the two defense witnesses, we agree with the Court of Military Review and are satisfied beyond a reasonable doubt that any unlawful command influence on either of the two witnesses did not affect the findings or sentence.

The first witness who was alleged to have been influenced was LT Gonzalez. He attempted to impeach the victim by testifying as to her reputation for drunkenness, promiscuity, and amnesic episodes. He did not appear to be the least bit intimidated. Gonzalez testified that the victim had a reputation for being promiscuous and an alcoholic. LT Gonzalez was impeached by a prior felony conviction, a false report in applying for his commission, bias against the victim, and

being disliked by his fellow officers for being untruthful.

In an affidavit before the Court of Military Review, Petty Officer Trickel asserted that he "was being verbally harassed by Warrant Officer Quillian and Lieutenant Commander Hensel." Hensel testified at trial for the defense that the victim had a reputation for promiscuity and that she appeared on the flight line intoxicated. Neither the affidavit nor the record of trial indicates any testimony that was suppressed because of his "harassment" by the two officers or the conversation with his Division Officer.

This is not the type of case where witnesses have been driven from the witness stand as in *Webb*. Appellant has failed to demonstrate what legally and logically relevant evidence was not admitted because of the allegations of interference with these two witnesses. Eleven witnesses testified for the defense concerning appellant's character for peacefulness and truthfulness. Five witnesses testified that the victim had a reputation for being "promiscuous" and "loose" and had no prior sexual relationship with appellant. One could argue that the reputation evidence introduced as to the victim in this case went far beyond that permitted by Mil.R.Evid. 412, Manual, *supra*. Cf. *United States v. Williams*, 37 MJ 352 (CMA 1993).

The decision of the United States Navy–Marine Corps Court of Military Review is affirmed.

Judges COX and GIERKE concur.

WISS, Judge (concurring in part and in the result):

In its effort to fit cases like *United States v. Kitts*, 23 MJ 105 (CMA 1986), and *United States v. Zagar*, 5 USCMA 410, 18 CMR 34 (1955), within the first sentence of Article 37(a), Uniform Code of Military Justice, 10 USC § 837(a), which by its literal terms addresses only "commanding officer[s]," the majority opinion explains that all of this Court's "command influence" cases have "involved some mantle of command authority in the alleged unlawful activity." 40 MJ at 211. I have no particular disagreement with the

accuracy of that statement or any particular disagreement with its legitimacy.

I do part company with the majority, however, with its implication that the "mantle of command authority" is limited to the formal structure of some particular command. The very essence of military relationships is that the orders of *superior commissioned officers, warrant officers, noncommissioned officers, and petty officers*—not just superior commanders—will be obeyed (in the absence of their illegality). *See, e.g.,* Arts. 90(2) and 91(2), UCMJ, 10 USC §§ 890(2) and 891(2), respectively. In this light, I would apply this Court's "very stringent standard and burden on the Government" (40 MJ at 211) which we set out in *United States v. Thomas,* 22 MJ 388 (1986), *cert. denied,* 479 U.S. 1085, 107 S.Ct. 1289, 94 L.Ed.2d 146 (1987), to any instance of unlawful influence by a superior commissioned, warrant, noncommissioned, or petty officer.

The complained-of influence of Lieutenant Gonzalez does not meet that situation; the pressure on him was peer pressure, brought to bear by fellow junior officers. Thus I concur with the majority's treatment of the issue as it relates to Gonzalez.

The alleged influence on Petty Officer Trickel, however, is an animal of a different color. Trickel testified that he had been pressured by superior commissioned officers—indeed, one of them was his Division Officer (though not literally a commander). Accordingly, I would apply the *Thomas* standard and burden to this allegation of command influence. Doing so, however, I am satisfied beyond a reasonable doubt that the unlawful influence on Petty Officer Trickel by his superior officers did not prejudice either the findings or the sentence in appellant's court-martial.

As a final note, I expressly condemn in the strongest possible terms the thuggery of the "Junior Officer Protection Association" in this case. Junior officers are protected by the *law;* they neither need nor are entitled to "protection" that is accomplished by *violation* of the law. *See* Art. 37(a) of the Code (second sentence); para. 96, Part IV, Manual for Courts–Martial, United States, 1984 (obstruction of justice prohibited by Article 134, UCMJ, 10 USC § 934).

SULLIVAN, Chief Judge (concurring in the result):

Article 37, Uniform Code of Military Justice, 10 USC § 837, is the touchstone of American Military Law. I reject its dissection by the majority opinion and the suggestion that the prejudice standard of *United States v. Thomas,* 22 MJ 388 (CMA 1986), *cert. denied,* 479 U.S. 1085, 107 S.Ct. 1289, 94 L.Ed.2d 146 (1987), is inapplicable to situations where courts-martial are unlawfully influenced by persons other than commanders. Moreover, I fail to see how this distinction assists this Court in vigilantly ensuring the integrity of military justice, *see Weiss v. United States,* —— U.S. ——, ——–——, 114 S.Ct. 752, 762–63, 127 L.Ed.2d 1 (1994), or otherwise promotes resolution of this case. Wavering in this matter conflicts with nearly a half century of tradition and practice at this Court.