**UNITED STATES**

v.

**Kenneth E. HARRIS, Aviation Electrician's Mate Second Class (E–5), U.S. Navy.**

**NMCCA 200401897.**

U.S. Navy–Marine Corps Court of Criminal Appeals.

Sentence Adjudged 15 Jan. 2004.

Decided 24 Jan. 2007.

---

**3.** The correct practice is to attach all exhibits, if marked for identification. R.C.M. 913(c)(2), Discussion.

Capt Rolando Sanchez, USMC, Appellate Defense Counsel.

Maj Wilbur Lee, USMC, Appellate Government Counsel.

Before GEISER and ROLPH, Senior Judges, and MITCHELL, Appellate Military Judge.

GEISER, Senior Judge:

Contrary to his pleas, the appellant was convicted by a special court-martial with enlisted representation of wrongful use of methamphetamines, in violation of Article 112a, Uniform Code of Military Justice, 10 U.S.C. § 912a. The appellant was sentenced to a bad-conduct discharge, 3 months confinement, forfeiture of $795.00 pay per month for a period of 3 months, and reduction to pay grade E–1. The convening authority approved the sentence as adjudged.

The appellant raises five assignments of error. First, he asserts that the military judge erred when he denied the appellant's pretrial and post-trial motions for unlawful witness interference. Second, the appellant avers prosecutorial misconduct in connection with the unlawful witness interference. Third, the appellant raises deficiencies in the staff judge advocate's recommendation and the convening authority's action. Fourth, the appellant asserts excessive post-trial processing delay. Finally, the appellant asserts that the military judge violated the appellant's confrontation clause rights when he admitted the urinalysis package into evidence.

We have examined the record of trial, the assignments of error, and the Government's response. We conclude that the findings and sentence are correct in law and fact and that no error materially prejudicial to the substantial rights of the appellant was committed. Arts. 59(a) and 66(c), UCMJ, 10 U.S.C. §§ 859(a) and 866(c).

## Background

During the early morning hours of 14 February 2003, the appellant was found digging in his neighbor's yard in the pouring rain and dressed only in a pair of muddy shorts. He was arrested by Kauai, Hawaii, police officers for trespassing and transported to their station. The police advised Navy authorities, who dispatched the appellant's command master chief, his division officer, and a corpsman. When command personnel arrived, the appellant appeared abnormally agitated and related a bizarre story about some "guys trying to kill him," and that he had been "digging for diamonds" in his neighbor's yard. Record at 381, 397. Concerned for his well-being, command personnel took custody of the appellant and transported him to a nearby hospital for evaluation. During the transit, in response to concerned questions by his shipmates, the appellant revealed that he had taken crystal methamphetamine. *Id.* at 383. This was reported to hospital authorities who treated the appellant and released him later that morning. Upon being apprised of the facts, the appellant's commanding officer directed that the appellant submit to a urinalysis test, which ultimately came back positive for methamphetamine. Prosecution Exhibit 4.

The appellant refused Article 15, UCMJ, 10 U.S.C. § 815, punishment and requested trial by court-martial. The command instead sent the case to an administrative separation board. Appellate Exhibit V at 2. In preparation for the board, the defense obtained an affidavit from a Mr. Foster, who admitted placing almost 2 grams of crystal methamphetamine into the appellant's drink without the appellant's knowledge. The defense provided a copy of the affidavit to the board recorder and indicated they would be calling Mr. Foster as a witness at the upcoming board. The recorder, Lieutenant Chen, JAGC, USN, called Mr. Foster to alert him to the time and date of the administrative hearing and to verify the witness's anticipated testimony. Lieutenant Chen viewed the affidavit as questionable, although he did not directly confront Mr. Foster. He did, however, ask whether Mr. Foster desired to consult with an attorney prior to speaking with him. Mr. Foster declined and validated the contents of the affidavit as true. The recorder did not threaten Mr. Foster during this conversation or otherwise say anything that would interfere with the witness's participation at the administrative hearing. AE LVIII at 2.

For various reasons the board was delayed several times. As the revised date of the board neared, the recorder again attempted to contact Mr. Foster both to ensure he would be available to testify for the defense at the rescheduled board hearing and to verify that the witness's anticipated testimony had not changed. Unable to contact Mr. Foster at the numbers provided by the defense, the recorder enlisted the help of Lieutenant Asher of the Kauai Police Department to locate and contact the witness. The recorder's main purpose for renewing contact with the witness was to ensure Mr. Foster's presence at the administrative separation proceedings and to find out if the witness still claimed the affidavit was true. The recorder expressly told Lieutenant Asher that the Navy was not threatening prosecution of Mr. Foster and, in fact, had no jurisdiction over Mr. Foster. Finally, the recorder did not instruct Lieutenant Asher to threaten or intimidate Mr. Foster or to try to get the witness to retract his earlier statement. *Id.* at 3.

During a voluntary face-to-face meeting with Mr. Foster, Lieutenant Asher stated that the affidavit appeared to constitute a confession to an offense under Hawaii statutes. The lieutenant voiced his intention to forward the document to the local prosecutor for review. He did not condition his intent to forward the affidavit on whether or not Mr. Foster continued to insist that the affidavit was the truth. Upon realizing his own potential criminal liability under Hawaii law, Mr. Foster admitted the affidavit was not true. He told Lieutenant Asher that he'd been trying to help a friend. He also explained that the appellant offered him $2,500.00 if he would make the statement. Mr. Foster immediately made a handwritten statement retracting the earlier affidavit. *Id.* at 4.

The administrative separation board was held on 15 July 2003. Due to "procedural problems," the board was either not recorded in its entirety or the recording was inadvertently erased. The appellant requested that his commanding officer set the board proceedings aside and renewed his request for court-martial, which his commanding officer now granted. Mr. Foster testified at the appellant's court-martial as a witness for the defense. He denied placing methamphetamine in the appellant's drink and admitted both making the original affidavit and that it was false. The original affidavit was admitted as substantive evidence for the members' consideration. Lieutenant Asher also testified and was thoroughly examined by the defense concerning his involvement in obtaining the retraction. Further, the appellant testified concerning the use of drugs and his involvement in obtaining the original affidavit. Although Lieutenant Chen was available, he was not called by either side.

At his court-martial, the appellant made a pretrial motion to suppress Mr. Foster's second statement claiming that the Government engaged in unlawful command influence when Lieutenant Chen wrongfully interfered with the testimony of a defense witness. The military judge took evidence, applied the three pronged test articulated in *United States v. Stombaugh*, 40 M.J. 208 (C.M.A. 1994), and balanced the probative value of the contested evidence against the danger of unfair prejudice. He determined that Mr. Foster's full testimony concerning why he made two different statements was crucial for the members to determine his credibility. Record at 181. Post-trial, the appellant requested reconsideration of the military judge's ruling in the context of a motion for dismissal or mistrial. The military judge reconsidered and again denied the appellant's motion. In this regard, he entered extensive findings of fact and conclusions of law. Appellate Exhibit LVIII.

### Unlawful Witness Interference

The appellant asserts that the military judge erred when he found beyond a reason-able doubt that unlawful command influence in the form of unlawful witness interference did not arise when Lieutenant Chen requested that Lieutenant Asher of the Kauai Police Department talk with Mr. Foster about his exculpatory affidavit.

The parties do not challenge the military judge's extensive findings of fact and we adopt them as our own. AE LVIII. With regard to legal analysis, the military judge's rulings were ambiguous. In the context of the pretrial motion to suppress Mr. Foster's second statement, the military judge held that the appellant presented sufficient evidence on the three factors [1] articulated in *Stombaugh*, 40 M.J. at 213, to shift the burden to the Government to either disprove that there was unlawful command influence or that the unlawful influence did not affect the findings and sentence. Record at 584–85. Later during the appellant's post-trial motion for dismissal or mistrial, the military judge reformulated his earlier analysis stating instead that the defense had presented sufficient evidence on the first *Stombaugh* factor which shifted the burden to the Government with respect to the remaining two factors. *Id.* at 636–37.

 The military judge's seemingly inconsistent rulings appear to reverse the traditional legal analyses relating to unlawful command influence when raised before trial and after the trial. To raise unlawful command influence before trial, the appellant must "show facts which, if true, constitute unlawful command influence, and that the alleged unlawful command influence has a logical connection to the court-martial in terms of its potential to cause unfairness in the proceedings." *United States v. Biagase*, 50 M.J. 143, 150 (C.A.A.F.1999). Post-trial or on appeal we are no longer dealing with the potential for future unfairness but rather with whether unfairness actually occurred. In this scenario, the appellant must (1) allege sufficient facts which, if true, constitute unlawful command influence; (2) show the proceedings were unfair; and (3) show that unlawful command influence was the proximate

---

1. The appellant must: (1) allege sufficient facts which, if true, constitute unlawful command influence; (2) show the proceedings were unfair; and (3) show that unlawful command influence was the proximate cause of that unfairness. *Stombaugh*, 40 M.J. at 213.

cause of that unfairness. *Stombaugh*, 40 M.J. at 213. Only by presenting evidence on all three factors does the defense raise the issue of unlawful command influence. The threshold for raising the issue of unlawful command influence is low, but must be more than mere allegation or speculation.

■ If unlawful command influence is successfully raised pre-trial, the burden shifts to the Government to show beyond a reasonable doubt that: (1) the predicate facts alleged by the defense are untrue; (2) the predicate facts alleged do not constitute unlawful command influence; or (3) the unlawful command influence will not affect the proceedings. *Biagase*, 50 M.J. at 151. If unlawful command influence is successfully raised post-trial or on appeal, the Government has the burden to show beyond a reasonable doubt either that: (1) there was no unlawful command influence; or that (2) the unlawful command influence did not affect the findings and sentence. *Id.*

■ We review a military judge's findings of fact under a clearly erroneous standard but we review *de novo* the legal question whether those facts constitute unlawful command influence or unlawful witness interference. *United States v. Ayers*, 54 M.J. 85, 95 (C.A.A.F.2000)(citing *United States v. Wallace*, 39 M.J. 284, 286 (C.M.A.1994)).

The essence of the appellant's argument is that, based on alleged inconsistencies between the testimony of various witnesses, the Government failed to meet its burden with regard to unlawful command influence. We disagree. Many of the statements and other evidence asserted in the appellant's brief are either inaccurate or taken wholly out of context. For example, the appellant's brief asserts, *inter alia*, that "once Lt. Asher threatened prosecution—a threat that Lt. Asher admitted was an empty one (Record at 134–35.)—Foster was forced to choose the path of self-preservation." Appellant's Brief at 11. This assertion goes beyond proper advocacy and simply misstates the record.

Lieutenant Asher specifically testified that he told Foster he (Asher) would be forwarding Foster's affidavit to the local prosecutor for review. Record at 134. Nowhere in the record does Asher testify that he ever "threatened" Foster with prosecution. Although he ultimately never forwarded the affidavit to the state prosecutor, Asher testified that the reason he did not forward it was because Foster recanted and therefore obviated the need to proceed further. *Id.* at 135. At the time Asher told Foster he was planning to forward the affidavit, he was, in fact, planning to do so. It was not, therefore, an "empty threat," as asserted in the appellant's brief.

The appellant's brief also takes isolated words and phrases wholly out of context. The appellant, for example, argues that Lieutenant Asher admitted that he expected to get a retraction from Mr. Foster; implying that such a retraction was Asher's goal in conducting the interview. Appellant's Brief at 9 (citing Record at 462). This assertion is wholly inconsistent with virtually all of Lieutenant Asher's other testimony. Lieutenant Asher specifically testified that he received no instructions or even requests from Lieutenant Chen other than to ascertain whether Mr. Foster was sticking by his original affidavit. While Lieutenants Asher and Chen were evidently suspicious of Mr. Foster's original confessional affidavit, there was no testimony or other evidence of a concerted plan, spoken or unspoken, to pressure or otherwise intimidate Mr. Foster into changing his earlier account. Record at 465–66. The consistently stated goal of both men was simply to ascertain the truth.[2]

Although not completely on point, the appellant's allegations are somewhat analogous to those in *Webb v. Texas*, 409 U.S. 95, 93 S.Ct. 351, 34 L.Ed.2d 330 (1972), where a trial judge, on his own initiative, warned a defendant's sole witness that he could get into real trouble if he lied and that his testimony would be personally brought to the attention of the grand jury by the judge.

---

**2.** Counsel must be careful to distinguish vigorous advocacy from assertions that misstate testimony in the record or fail to place cited testimony into an accurate context. To do otherwise is to raise the danger that appellate authorities may be misled by counsel's assertions of fact. Moreover, to do so raises significant ethical issues in regard to counsel's candor to this tribunal.

The witness thereafter refused to give any testimony. *Id.* at 96, 93 S.Ct. 351.

The instant case can be distinguished, however, on two important points. In *Webb*, the witness in question did not testify at trial, thereby denying the defendant an opportunity to present testimony relevant to his case. In the case at bar, Mr. Foster testified at trial and the members were given the opportunity to consider not only his testimony but also the original exculpatory affidavit and the subsequent retraction. Further, the members heard from both Lieutenant Asher and the appellant, who put Mr. Foster's original affidavit and its subsequent retraction into context.

Second, the judge in *Webb* expressly threatened only the single defense witness with prosecution if he lied under oath. None of the Government witnesses were similarly admonished. The witness, who was currently incarcerated on unrelated charges, was told that if he lied under oath, the judge would "personally" see that the witness's case went to the grand jury, that the witness would "be indicted for perjury," that the witness would likely be "convicted of perjury," and that the witness would likely have to serve additional time in prison. *Id.* at 95, 93 S.Ct. 351. In the instant case, Lieutenant Asher spoke in a calm, unthreatening manner. The information he provided regarding Hawaii law was factually accurate and was not embellished with any forceful assertions of dire consequences if Mr. Foster lied. In fact, the lieutenant never even speculated what the local prosecutor might decide to do.

Having reviewed the entire record of trial, we find that the appellant successfully raised unlawful command influence and that the Government thereafter met its burden to show beyond a reasonable doubt that the facts alleged by the appellant did not constitute unlawful witness interference or unlawful command influence. The military judge's findings of fact establish that neither Lieutenant Chen nor Lieutenant Asher threatened or otherwise attempted to intimidate Mr. Foster into changing his testimony. Lieutenant Asher simply and quite properly clarified Mr. Foster's misunderstanding of the potential legal ramifications implicit in

his sworn affidavit. Mr. Foster thereafter made a voluntary decision to change his story based on his new and more accurate understanding of the law. We find, therefore, that the military judge did not err when he denied the appellant's motion to dismiss the charge and specification or to declare a mistrial.

### Confrontation Clause

The Confrontation Clause of the Sixth Amendment states that, in all criminal prosecutions, the accused shall enjoy the right to be confronted with the witnesses against him. U.S. CONST. amend VI. The United States Supreme Court articulated the practical contours of this right when they held in *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), that in order for the prosecution to introduce "testimonial" out-of-court statements into evidence against an accused, the Confrontation Clause requires that the witness who made the statement be unavailable, and that the accused have had a prior opportunity to cross-examine the witness. Our superior court in *United States v. Magyari*, 63 M.J. 123 (C.A.A.F. 2006), *cert. denied*, 127 S.Ct. 323 (2006), refined the Supreme Court's reference to "testimonial" out-of-court statements in *Crawford* when it held that a drug laboratory report occasioned by a positive urinalysis test was not a "testimonial" out-of-court statement implicating *Crawford* or the Confrontation Clause.

Citing to both *Crawford* and *Magyari*, the appellant argues that the military judge erred when he admitted Prosecution Exhibit 4 (a Navy Drug Laboratory report based on a probable cause urinalysis) into evidence because admission of the report violated the appellant's Sixth Amendment right to confront the witnesses against him. Appellant's Supplemental Brief of 25 Aug 2006 at 2. We disagree.

The appellant is correct that our superior court in *Magyari* expressly couched its holding in the context of a random urinalysis screening and rejected a Government contention that "lab reports are inherently not testimonial." *Magyari* 63 M.J. at 127. The court contrasted a lab report reflecting the results of a random urinalysis test with lab

reports prepared at the behest of law enforcement in anticipation of a prosecution, which may, the court noted, make the reports testimonial. *Id.*

■ We agree that lab reports involving blood or DNA tests conducted at the behest of law enforcement during an investigation or lab reports solicited by law enforcement personnel during an investigation of a particular individual suspected of operating a vehicle under the influence of drugs or alcohol may make cross-examination of testing officials appropriate. *Id.* As in *Magyari*, however, such is not the situation in the instant case.

■ As in *Magyari*, the urine sample in this case was sent to the San Diego Navy Drug Screening Lab. Upon arrival, all samples are checked for integrity and grouped into batches of 100, to include 97 actual samples and 3 blind quality control samples. Record at 318. Each sample within the batch of 100 is assigned a discreet laboratory accession number so that laboratory personnel have no way of knowing who a particular sample among the 100 belongs to. *Id.* at 319. Each sample is then subjected to an initial screening to eliminate those that are definitely negative. *Id.* at 321. All samples testing positive are subjected to a second screen using a fresh aliquot of urine. All samples that again test positive on the second screen are then subjected to a far more sophisticated and sensitive gas chromatography/mass spectrometry test. *Id.* at 322.

It is clear, therefore, that notwithstanding the fact that the appellant's command sent in a single urine sample taken under a probable cause premise, the lab personnel inserting data into the challenged report would have no way of knowing either the testing premise or the identity of the individual. They would have no way of knowing whether prosecution was anticipated or whether the sample was part of a normal random urinalysis screening. In view of this, and consistent with our superior court's analysis in *Magyari*, we find that the data in the lab report reflecting the appellant's positive urinalysis test result for methamphetamines was non-testimonial under *Crawford* and was properly admitted at trial as a record of "regularly conducted" activity of the Navy Drug Screening Labora-

tory that qualifies as a business record under MILITARY RULE OF EVIDENCE 803(6), MANUAL FOR COURTS-MARTIAL, UNITED STATES (2002 ed.), a firmly rooted hearsay exception. *See Ohio v. Roberts,* 448 U.S. 56, 66, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980).

### Post–Trial Delay

■ The post-trial delay in the appellant's case does not rise to the level of a due process violation. *United States v. Jones,* 61 M.J. 80, 83 (C.A.A.F.2005)(citing *Toohey v. United States,* 60 M.J. 100, 102 (C.A.A.F. 2004)). We concur with the Government's assertion that the relevant starting date for post-trial processing analysis is the date the case was finally completed to include all post-trial Article 39(a), UCMJ, sessions. In the instant case, that date was 2 July 2004 when the military judge issued his final ruling on the appellant's post-trial motion. Post-trial processing time between the completion of trial and 3 February 2004, when the case was docketed with this court, was 244 days. Processing times at each post-trial stage were reasonable given the length of the record, the nature of the motions presented, and the appellant's several post-trial clemency requests including a large binder containing an 84 page letter from the appellant along with 70 enclosures. *See United States v. Moreno,* 63 M.J. 129 (C.A.A.F 2006). We further find that the length of the delay in this case does not affect the findings and sentence that should be approved under Article 66(c), UCMJ. *United States v. Brown,* 62 M.J. 602 (N.M.Ct.Crim.App.2005)(en banc)(citing *United States v. Tardif,* 57 M.J. 219, 224 (C.A.A.F.2002)).

### Conclusion

In view of our findings above, the appellant's remaining assignments of error are without merit. The approved findings and sentence are affirmed.

Senior Judge ROLPH and Judge MITCHELL concur.