**UNITED STATES, Appellee,**

v.

**James M. DENIER, Major, U.S. Air Force, Appellant.**

No. 96–0435.

Crim.App. No. 31036.

U.S. Court of Appeals for the Armed Forces.

Argued Jan. 8, 1997.

Decided Sept. 30, 1997.

Sullivan, J., filed opinion dissenting in part and concurring in the result.

For Appellant: *Lida Stout Haskett* (argued); *Major Kevin P. Koehler* (on brief); *Colonel David W. Madsen* and *Lieutenant Colonel Kim L. Sheffield.*

For Appellee: *Major LeEllen Coacher* (argued); *Colonel Theodore J. Fink* and *Lieutenant Colonel Michael J. Breslin* (on brief); *Colonel Jeffery T. Infelise.*

*Opinion of the Court*

COX, Chief Judge:

This case involves a post-trial claim by a defense witness that he overheard a conversation between court members indicating that the members had been subjected to unlawful command influence. We sustain the findings of both courts below that whatever the witness may have heard did not amount to evidence of command influence, so we affirm.

Appellant was convicted by a general court-martial with members at Seymour

Johnson Air Force Base, N.C., in accordance with his plea by exceptions and substitutions of conduct unbecoming an officer, in violation of Article 133, Uniform Code of Military Justice, 10 USC § 933.[1] Contrary to his pleas, he was convicted of distributing cocaine, in violation of Article 112a, UCMJ, 10 USC § 912a. The panel sentenced him to dismissal, confinement, and forfeiture of $2000.00 pay per month for 2 years. The convening authority approved the sentence, and the Court of Criminal Appeals affirmed. 43 MJ 693 (1995).

We granted review of these issues:

## I

WHETHER THE MILITARY JUDGE ERRED BY FAILING TO FIND UNLAWFUL COMMAND INFLUENCE IN MAJOR DENIER'S CASE AND TO GRANT A REHEARING FOLLOWING A POST–TRIAL ARTICLE 39(a), UCMJ, SESSION WHERE THE MILITARY JUDGE LEARNED THAT TWO PANEL MEMBERS HAD DISCUSSED MAJOR DENIER'S CASE IN A LATRINE AND THAT THEY BELIEVED THAT BECAUSE OF "COMMAND INTEREST" THEY HAD NO CHOICE BUT TO RENDER CERTAIN RESULTS IN APPELLANT'S COURT–MARTIAL.

## II

WHETHER BASED UPON THE "COMMAND INTEREST" CONVERSATION TWO PANEL MEMBERS HAD IN A LATRINE AT LEAST TWO OF THE COURT MEMBERS WERE NOT FREE TO RENDER AN IMPARTIAL VERDICT AND DID NOT ANSWER HONESTLY DURING VOIR DIRE.

We resolve both issues against appellant.

The Court of Criminal Appeals set out the background facts succinctly:

Appellant was a married emergency room physician at Seymour Johnson Air Force Base, North Carolina. He has prior active duty service as an Army physician. Mrs. G is the young wife of an Air Force enlisted man, Airman First Class G. Appellant saw Mrs. G as a patient, treating her for a variety of medical problems. Appellant used this professional contact as a springboard for a personal relationship, which included drinks at a bar, rides in his sports car, and discussion of a motel room rendezvous. Appellant admitted this unbecoming conduct, which formed the basis for his guilty plea to the Article 133 offense. At the appellant's request, the military judge informed the court members of his guilty plea before they heard evidence on the contested cocaine distribution charge.

The remaining facts are in dispute. According to Mrs. G, she admitted past use of cocaine during one of her conversations with the appellant. Subsequently, the appellant told Mrs. G that he could supply her with some. Mrs. G told her husband about her relationship with the appellant, including his cocaine offer. Airman G was irate, and reported the matter to the Air Force Office of Special Investigations (AFOSI) at Seymour Johnson. AFOSI agents contacted Mrs. G and she agreed to help them. AFOSI agents monitored a telephone conversation between the appellant and Mrs. G., and set up a "sting" operation in a Seymour Johnson billeting room.

AFOSI installed a video camera (picture only, no sound) in the billeting room. Mrs. G knew there was a camera, but the agents did not tell her where it was. By happenstance, the appellant put several bottles in front of the camera, obscuring the view of the appellant and Mrs. G much of the time. As a result, we never see cocaine produced

---

1. Appellant acknowledged all the elements to the offense of conduct unbecoming an officer and most of the specific conduct alleged. The sole point of departure concerned one portion of the conduct alleged in the specification pertaining to his "inviting her to have alcoholic drinks" at public drinking establishments. With respect to that portion of the conduct, appellant pleaded guilty only to "talking to her about having alcoholic drinks" at public drinking establishments. The prosecution elected to attempt to prove the charged language, but the members found appellant guilty in accordance with his pleas.

by either the appellant or Mrs. G. However, while the appellant is out of the room getting ice, we have an unobstructed view of Mrs. G, and she does not take anything from her body or clothing. Upon Mrs. G's signal that cocaine had been passed, agents entered the room, discovered cocaine spread out on a table, and apprehended the appellant. AFOSI also seized a razor blade and a straw cut in two pieces from the appellant's briefcase.

Appellant testified he was the victim of an extortion scheme cooked up by Airman and Mrs. G. According to the appellant, Mrs. G must have secreted the cocaine in her clothes or a body cavity, taken it out while he was out of the billeting room getting ice, and signaled AFOSI agents to enter.[2] Appellant explained he used the razor blade to cut up his own prescription medication into smaller doses, and cut the straw so Mrs. G could play with the pieces. He then described receiving "anonymous" letters—but written in such a way to obviously imply that the author was Airman G—demanding money in exchange for dropping the charges. Appellant's civilian lawyer submitted these letters to a private forensic consultant, who discovered a hidden, indented writing on one letter. This hidden writing purported to be the full signature of Airman G.[3]

43 MJ at 696–97 (footnote omitted).

The granted issues derive from a post-trial letter and the post-trial Article 39(a), UCMJ, 10 USC § 839(a), testimony of Captain Deputy Sheriff Michael Farrell of Burke County, Georgia. Farrell was a friend of appellant and a retired Army major. As a service company commander, Farrell had been appellant's commander for a time when appellant was in the Army. Farrell traveled to Seymour Johnson AFB on appellant's behalf as a potential defense character witness at the court-martial. Ultimately, Farrell was not called upon to testify, but instead his written statement was submitted during the presentencing phase of the trial. Farrell asserts that, as a potential witness, he "waited outside" the court room as instructed and did not attend any sessions of the trial.

The granted issues relate to a conversation Farrell reports overhearing in a latrine near the court room on the fourth day of the court-martial. *See infra.* Farrell deduced that the participants to the conversation were court members, and he regarded the tenor of the conversation as highly improper. Farrell concluded that command influence must have been at play in the court-martial and that, as a result, the members were predisposed to find appellant guilty or to sentence him severely.

Though Farrell had abundant opportunity to alert defense counsel or appellant of this impending injustice during recesses in the court-martial, he did not do so. Instead, he returned to Georgia before findings were announced. According to Farrell's post-trial testimony, he decided not to destroy the putative court members' careers. He reasoned:

> I know how difficult it is to get promoted in the service. I know by looking at those fellows with the amount of decorations they had that they were comers and they had a career ahead of them. I thought, and I wasn't privy to anything that went on in the trial inside the courtroom because I never sat inside of it, so I don't know if Major Denier was innocent or guilty, except that they found him guilty. I figured in my mind, I figured if I opened

2. In closing argument, trial counsel pointed out the unlikelihood that Mrs. G—knowing that she was being videotaped—would produce drugs from some location that had escaped detection during the search before her meeting with appellant.

3. Apparently, the defense produced these documents the day before trial, having sat on them for weeks. On cross-examination, trial counsel asked appellant, in effect, why they were trying to blind-side the court-martial with these documents? Why, instead, had he not brought these allegedly exculpatory documents to the attention of the authorities sooner, if they were real? The authorities obviously would have pursued that line of inquiry, and if the documents had come from Airman or Mrs. G, their allegations would have been cast in a radically different light. Appellant could not, however, explain why the documents were being sprung on the court-martial, other than to attribute the tactic to civilian defense counsel.

up this, I said "this is a can of worms," and I figured that if he was found guilty that he wouldn't get a harsh sentence, which I considered that sentence harsh.

He further explained:

I did not think that Major Denier would be found guilty or at least punished to the extent that he was punished. And I was going to let sleeping dogs lie.

When he found out the results of the trial, Farrell was "shocked." As he later testified:

I balanced men's careers who I think probably thought that they were doing the right thing against Major Denier's life. And when I found out what his punishment was going to be, I said well "In that case I think that what happened is that they were given the word to slamdunk him and they did," and I said, "at that point in time, you've got to do something about it."

What Farrell decided to do was to write the Secretary of the Air Force. While he was in the process of writing the letter, he happened to have lunch with one of the judges in his county, and he asked the judge his opinion on the matter. The judge reportedly commented, "Oh, if I were the sitting Judge, I'd be interested. I'd want to know." But Farrell did not notify the military judge, or trial counsel, or defense counsel, or even appellant.

Instead, he sent the following letter, dated September 8, 1993, to the Secretary:

# Burke County Sheriff's Office

225 Highway 24 South • Waynesboro, Georgia 30830 • Telephone 706-554-8713/8714

September 8th, 1993

Gregory T. Coursey
Sheriff

Capt. Farrell
Logistics and
Training Officer

SECRETARY OF THE AIR FORCE
PENTAGON, WASHINGTON, DC 20340

Mister Secretary,

I am writing you in hopes of correcting a politically correct decision (but a wrong one) that has destroyed an officer of your service who was also an officer in one of my past commands.

I was subpoenaed as a witness for the defense for the General Court Martial of Major James Denier at Seymore Johnson Air Force Base on August 16th through August 23rd, 1993. On Friday, the 20th of August, I was seated in a stall of the first floor latrine and overheard two men talking about the case. The gist of the conversation was that if it weren't for the "fuck up" at tail hook and the command interest, this guy would get off with a slap on the wrist. The other voice said, "Shit happens, as long as it's not us." I rose from the stall and caught site of the speakers - they were USAF LTC's in their Blue uniforms and as such, members of the jury. I could not see their names and since they were all about the same size I could not be sure which ones they were. I did notice both were rated aviators and one was additionally wearing jump wings.

I have mulled this over for some time and feel that you are the best man to handle this situation. I believe that if you have one of your legal types look over this case you will see that what I overheard had a bearing on the case's outcome.

I feel no need to go to the politicians with this information. I always hated Congressionals and having to defend my command or my decisions without having had a chance to look into the allegations made by my accuser or the complainant without pressure.

Please take what steps you think proper. I of course will be happy to repeat this information under oath or make a sworn statement which ever you deem necessary.

If you could have one of your staff keep me informed, I would appreciate it.

As an aside, during the Vietnam War, my strikers and I came across a downed USAF F.A.C. pilot and we brought him out when we crossed back into South Viet Nam. He was grateful and said he owed us. Have a look at this case on it's merits and consider my statements, and I will call it even.

MICHAEL FARRELL
Captain, Deputy
Major, USA, Retired

In due course, the information was forwarded to the military judge, who immediately ordered counsel to review the letter and to communicate to him their respective positions. In accordance with the defense response, the military judge then ordered a post-trial Article 39(a) session. As it was ascertained that three of the six court members would not be available at the time of that session, and indeed that one of the members was abroad on an extended assignment, the military judge drafted a proposed questionnaire for the members, which he provided to counsel.

After the military judge reviewed counsel's comments and made revisions based thereon, a two-page packet was distributed to the

members. *See* Appendix I at 262. The first page was an introductory, explanatory letter to the members. The letter required the members to acknowledge, by signature, that they had "Received and understood" the documents. All members signed the first document.

The second page was the questionnaire, advising the members of the general nature of the allegedly overheard conversation, and asking the members to indicate, by initialing, the appropriate response. All of the members initialed the response:

> I am absolutely certain that I never overheard nor participated in such a conversation, nor am I aware that this or a similar conversation occurred.

All but one of the questionnaires was signed by the respective members and attested by facially *bona fide* officials. The remaining questionnaire was not signed by the member, but was nevertheless subscribed by an officer described as "CAPT, USAF[,] ASST OPERATIONS OFFICER." At the post-trial Article 39(a) session, the military judge accepted all documents from the members as appellate exhibits; there were no objections by the parties.

After receipt of the documents, the only witness at the post-trial session was Mr. Farrell, who was called at the behest of the court. He testified that he had been present at the court-martial "on Monday [August 16, 1993], and ... [he] stayed through till Saturday [August 21]." The court-martial was in session from Tuesday, August 17, through Saturday, August 21, and it was completed on Monday, August 23. Farrell testified that, during the entire week he was at Seymour Johnson AFB, he "waited outside [the court room] as ... [he] was instructed."

Apparently, Farrell had at least a general idea of who the court members were, because when asked by civilian defense counsel about "the movement of the jury in and out of the courtroom, down the hallway in front of the courtroom from using the latrines during that week," he testified:

They were up and down that hallway a number of times. When you released them from the courtroom, they'd walk up—I guess their jury room was up that way. I don't know for sure, but I would think so because they would walk up that way. Sometimes they walked and got coffee out of the little coffee break room.

Farrell remembered that the members "always wore ... [their Air Force dress blues]. [He] remember[ed] it was hot and the air conditioner wasn't working very well in the building."

When asked by the military judge to "describe in words as accurate as you remember, the entire conversation, that you overheard" in the latrine, Farrell replied:

Well, I put down in my letter what I remembered, and as time goes on, my memory ... I didn't take notes when I was in the stall. I refrained from putting in one of the comments in that letter because I didn't really think it had a lot to do with what I found out, and I thought it was kind of disrespectful, so I didn't put it in there. But it led me to believe that these two people who were speaking were members of the jury. They were rather crude in their remarks concerning the prosecutor and they said several crude things and then they went on to say basically that "if it weren't for command interest and problems they were having with the sexuality with the Tailhook scandal," their words, not mine, "Major Denier probably wouldn't get found guilty or just get a slap on the wrist." One of them said, and I remember that, he said, "Shit happens," and the other fellow said, "As long as it doesn't happen to me," which is not very complimentary, but that's basically what they said. The reason I didn't put the comment about the prosecutor down was because, like I said, it was kind of rough and I didn't know where that letter was going to go and who was going to read it.[4]

---

4. Farrell later asserted that the supposed members called the prosecutor a "dumb c ..." and added "that if it wasn't for the fact that there was some command interest, she wouldn't get a conviction."

When the military judge asked whether the conversation was really about the prosecutor, Farrell responded:

What I thought was, and I think this is exactly ... This is what I thought. I thought what they said was that they had made up their mind the prosecutor wouldn't have got a conviction. That's what I thought, and I thought that's what they were saying, and I still believe that's what they are saying, that they had made up their mind and that there was in fact command interest or influence.

On examination by defense counsel, Farrell expanded:

It's very clear to me when they said that about the prosecutor and then they said about command influence and they said about Tail Hook, that they had been leaned on and told what to do.

When Farrell "hear[d] a zipper go up," he "stood up to see if ... [he] could catch a good view of the people who were making these statements." Cracking the stall door, he noticed that both men were lieutenant colonels, both were in blue uniforms, and both were Caucasians. According to Farrell,

they all [sic] had what I call "fruit salad," a bunch of ribbons. It looked like they were aviators, but they had some big wings, but one of them was a parachutist.

Farrell testified that he did not get a good look at their faces and that, even if they were standing in front of him, he could not identify them.

A review of the court-members' official records revealed that all were male lieutenant colonels, all were Caucasian, two of the six were authorized to wear jump wings, and four of the six were authorized to wear aviator wings. Further, the military judge noted for the record that, with the exception of civilian defense counsel, everyone associated with the court-martial wore the Air Force "Class A uniform" throughout the trial.

In Farrell's recollection, this conversation occurred on Friday [August 20]. With the concurrence of the defense, the court members had been informed by the military judge on Tuesday, August 17, that appellant had pleaded guilty to conduct unbecoming an offi-cer in connection with his relationship with Mrs. G.

Based on Farrell's testimony that he did not see the supposed members' faces, the defense agreed with the military judge that it would be useless to have Farrell attempt to identify the speakers "through photographs or otherwise." Neither the military judge nor the parties desired that any other witnesses be called.

Thereafter, the military judge heard the arguments of counsel. In essence, the defense argued that command influence had been sufficiently shown to warrant setting aside the findings and sentence and that a rehearing should be granted or the charges dismissed. The Government disputed the probability of Farrell's testimony. The military judge then adjourned the post-trial Article 39(a) session on November 2, 1993, pending transcription and authentication of the record.

On November 16, 1993, the military judge authenticated the record and issued Post–Trial Ruling No. 1. Appendix II at 264. Therein he cited many of the facts set out above. The judge seems to have concluded that Farrell indeed overheard a conversation in the latrine and that there was a "reference to Tailhook and the command interest that followed." However, the judge was not impressed, for a variety of reasons, with the "interpretation of the conversation" derived by Farrell. Ultimately, the judge concluded, "There is *no evidence* that any unlawful command interest, direct or indirect, was brought to bear upon the members in this case." (Emphasis added.) Accordingly, the military judge found no basis to impeach the findings and sentence. *See* RCM 923, Manual for Courts–Martial, United States (1995 ed.).

The Court of Criminal Appeals similarly found various "dubious aspects of Mr. Farrell's story." Assuming—not finding—Farrell's testimony to be substantially accurate, that court held:

Appellant has presented *no evidence* that anyone "acting with the mantle of com-

mand authority" attempted to influence this court-martial.

43 MJ at 699 (emphasis added), citing, *inter alia, United States v. Ayala,* 43 MJ 296, 300 (1995); *United States v. Stombaugh,* 40 MJ 208, 211, 213 (CMA 1994); *United States v. Allen,* 33 MJ 209 (CMA 1991); *United States v. Thomas,* 22 MJ 388 (CMA 1986).

Before this Court, appellant reiterates his contention that command influence tainted his court-martial, and he argues that, "[a]t the very least, ... a *DuBay* hearing [should] be held to resolve unanswered questions concerning the nonresponse of one of the court members through his unsigned affidavit." Final Brief at 12. *See United States v. DuBay,* 17 USCMA 147, 37 CMR 411 (1967). Appellant also argues that the alleged conversation demonstrates that he "did not receive a fair trial," in that "at least two of ... [the members] were not candid during *voir dire* about outside influences on their decisions as court members...." Final Brief at 12.

We noted in *Thomas, supra* at 393, that "[c]ommand influence is the mortal enemy of military justice." In pertinent part, Article 37(a), UCMJ, 10 USC § 837(a), denounces command influence in these terms:

No person subject to this chapter may attempt to coerce or, by any unauthorized means, influence the actions of a court-martial or any other military tribunal or any member thereof, in reaching the findings or sentence in any case, or the action of any convening, approving, or reviewing authority with respect to his judicial acts.

We have construed the unlawful-command-influence species of Article 37 as "involv[ing] some mantle of command authority in the alleged unlawful activity." *Stombaugh, supra* at 211. [5]

■ Appellant's burden here was to demonstrate that someone "acting with the 'mantle of command authority'" attempted to influence the court-martial. *Ayala,* 43 MJ at

300. Being a court without factfinding power, Art. 67(c), UCMJ, 10 USC § 867(c)(1994), we accept the assumptions of the courts below that Farrell was not fabricating in claiming that he overheard a conversation relating to the Tailhook scandal and its impact on the military community. Mere common knowledge, however, of front-page, newsworthy events does not equate to evidence of improper command influence.

The lower court's conclusions that no evidence of command influence was shown by the proponent are fully justified in this record. In particular, the findings of the military judge make it clear that: (1) all of the members denied making any of the disputed statements; (2) Farrell could not positively identify the statements as having been made by a court member; (3) the circumstances raised significant doubts as to the precision of Farrell's recollection, and Farrell's recollection of the substance of the conversation "lack[ed] credibility"; (4) the defense introduced no evidence of influence by persons acting under the mantle of command authority, and the defense was not denied any opportunity to obtain such evidence from the members or the command.

■ We also reject appellant's call for a *DuBay* hearing to investigate further the unsigned affidavit of one of the members. First, when of the matter of the affidavits was expressly before the court-martial in post-trial session, the defense offered no objection to the documents and it affirmatively declined the opportunity to call additional witnesses. The opportunity to obtain a fuller explanation of the member's affidavit was thereby waived.

Furthermore, there is a perfectly plausible explanation for the absence of the signature. The documents were sent as part of a two-page packet. The member was requested to sign the first page, which he did. The place for signature attestation was at the bottom of

---

**5.** We have previously recognized that the literal language of Article 37(a), 47 MJ at 261, includes circumstances in which the unlawful coercion comes from a person not acting with the "mantle of command authority." *Stombaugh,* 40 MJ at 213. In this case, however, where the issue

expressly framed by appellant relies upon "unlawful *command* influence" (emphasis added) as the source of alleged unlawful influence, we confine our inquiry to whether the source of that alleged influence acted with "some mantle of command authority." *Id.* at 211.

the second page. If the document was perceived as an integrated, two-page submission, it would seem quite plausible to construe it as unnecessary to sign more than once. This assumption is buttressed by the fact that the place for the affiant's signature on the second page is indented beneath the election requesting a private conference with the military judge. This juxtaposition may readily have suggested that the second page should only be signed if the member was requesting such a conference. The defense's disinterest in seeking more information when the opportunity was afforded moots further speculation.

■ Appellant's allegation of partiality of the court members also fails. Even though no evidence of unlawful command influence was presented, a member's partiality would be open to question, of course, if it were shown that the member believed that a particular result should be obtained to please the command. In such circumstances, there would be no requirement to prove that a person with the mantle of command authority had acted improperly because the issue of impartiality focuses on the belief of the member, not the position of the command. Here, the responses by the members to the questionnaire, in light of the military judge's and Court of Criminal Appeals' findings that Farrell's recollection lacked credibility, are sufficient to reject the claim of partiality.

The decision of the United States Air Force Court of Criminal Appeals is affirmed.

Judges CRAWFORD, GIERKE, and EFFRON concur.

SULLIVAN, Judge (dissenting in part and concurring in the result):

The legal premise of this opinion disturbs me and should disturb others who worry about the danger of someone unlawfully influencing the action of a court-martial. *See generally* Art. 37, Uniform Code of Military Justice, 10 USC § 837. Specifically, the majority misreads or misinterprets this codal provision in a way that significantly narrows a servicemember's protection from an unfair trial. *See United States v. Ayala*, 43 MJ 296, 301 (Sullivan, C.J., concurring in part, dissenting in part, and joining Wiss' dissent). In Article 37(a), Congress has said that "[n]o person subject to this chapter" can lawfully influence the outcome of a court-martial. The majority in the case at bar ignores the plain words of this statute and adds, without support, its own words, "acting with the 'mantle of command authority.'" 47 MJ at 261; *see Ayala*, 43 MJ at 300 ("pressure from peers is not unlawful ... influence, ... 'command' or otherwise"). The majority's judicial addition to Article 37 cannot be allowed.

An added burden is placed on an accused trying to prove his or her trial was unlawfully influenced. It means he or she not only has to prove that the trial was improperly influenced by a military member subject to the UCMJ (the statute's only requirement) but also that the military member violating Article 37 was wearing something—a "mantle of command authority"—whatever that means. While this claimed error has been shown *on the record* to be harmless to appellant (*see, e.g., United States v. Sullivan*, 26 MJ 442 (CMA 1988)), I do not agree that his claim should be rejected out of hand as legally insufficient.

Hopefully, the majority would find Article 37 was violated if a court-martial member tried to unlawfully influence the court-martial he was sitting on pursuant to secret written orders from the base commander of an air base. *See United States v. Miller*, 19 MJ 159 (CMA 1985). There, the majority would find that Article 37 was violated since there would be someone "acting with the 'mantle of command authority'" interfering with the operation of a court-martial. Is not this too much to prove? In my view, all that needs to be proved in this case is that someone subject to the UCMJ tried to improperly influence the vote of the court members either as to findings or sentence. Article 37 clearly indicates on its face that rank or grade or command does not matter when the fairness of a court-martial is at issue. Moreover, we have long recognized the subtle and sophisticated ways that unlawful influence may effect a court-martial in its solemn task. Accordingly, I cannot join this continued judicial evisceration of this critical provision of the Uniform Code of Military Justice. *United States v. Stombaugh*, 40 MJ 208, 215 (CMA 1994) (Sullivan, C.J., concurring in the result).

# APPENDIX I

Dear Court Member:

An issue has arisen concerning the case of U.S. v. Major James M. Denier, in which you served as a member of the Court.

Please review and answer the attached question. The answer must be provided under oath, so you should swear before either a Notary Public or a commissioned officer authorized to administer oaths.

Once you have answered the question, please indicate your receipt for·and understanding of this instruction letter by signing at the·bottom in the space provided. The originals should be mailed or hand-carried to the Seymour Johnson base legal office in a sealed envelope marked as follows; Colonel Robert E. Sears, Military Judge. Your response is due NLT 27 October 1993.

Due to the restrictions regarding any comments about your opinions or those of any other court member pertaining to your deliberations, as I instructed you during trial, you are now instructed that you are to answer the question posed on the following page but are not to elaborate upon your answer. Further, you are not to discuss this matter with any other person, including other members of the court and you may not answer any questions or discuss this issue with the Staff Judge Advocate or any member of the trial or defense teams unless I or some other Military Judge orders you to do so.

ROBERT E. SEARS, Colonel, USAFR
Military Judge

Received and understood this _____ day of _____, 1993.

_____ (Signature)

_____ (Printed name and rank)

*Approved.*

[Page 1 of Appendix I]

APPENDIX I—Continued

Question to Court Members

During the trial of U.S. v. Major James M. Denier, a conversation may have taken place on Friday, August 20, in the first floor latrine of the building in which the trial was being held. The gist of that conversation between two individuals was that "If it weren't for the fuck-up at Tailhook and the command interest, this guy would get off with a slap on the wrist." In response, another voice said, "Shit happens, as long as it's not us."

Please provide your answer by placing your initials in one or more of the following blocks, as applicable. Do not provide any elaboration for your answer.

_____ I am aware that this or a similar conversation occurred.

_____ I am absolutely certain that I never overheard nor participated in such a conversation, nor am I aware that this or a similar conversation occurred.

_____ I wish to discuss this matter further with the Military Judge. (I understand, however, that I am to discuss it with no one, including the Military Judge, until I receive further instructions.)

_____ (Signature)

_____ (Printed name and rank)

The above statement was sworn and subscribed to by the above-named individual before me this _____ day of _____, 1993.

_____ (Name)

_____ (Title)

[Page 2 of Appendix I]

## APPENDIX II

DEPARTMENT OF THE AIR FORCE
Air Force Legal Services Agency
USAF Judiciary, Eastern Circuit, Northern Region
Bolling Air Force Base, DC

| | | |
|---|---|---|
| U N I T E D  S T A T E S | ) | |
| | ) | |
| v. | ) | Post-Trial Ruling No. 1 |
| | ) | |
| JAMES M. DENIER, Major, USAF | ) | |
| 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 | ) | |
| 4th Medical Group (ACC) | ) | |
| Seymour Johnson AFB, NC | ) | 16 November 1993 |

BACKGROUND. The accused was tried and convicted as charged of a single specification of conduct unbecoming an officer and a gentleman and a single specification of distribution of cocaine by a General Court-Martial of officer members at Seymour Johnson AFB, Nc on 17-21 and 23 August 1993. Subsequent to the trial but before authentication of the record, a defense witness forwarded a letter to the Secretary of the Air Force recounting an alleged conversation in the men's restroom between two court members during the trial. A post-trial article 39(a) session was held at Seymour Johnson AFB, NC on 2 November 1993 to explore whether any unlawful command influence had been brought to bear upon the court members and, if so, to consider an appropriate remedy. The author of the letter, Mr. Michael A. Farrell, testified at the post-trial session.

FINDINGS OF FACT. Prior to voir dire of the members, the accused initially entered a plea of guilty to Charge I and its specification, a violation of Article 133 of the UCMJ, specifically, conduct unbecoming an officer and a gentleman and a plea of not guilty to Charge II and its specification, a violation of Article 112a, specifically, distribution of cocaine (R.9). During the CARE inquiry, the plea as to Charge I was modified to a plea of guilty by exceptions and substitutions (R> 18). The specification of Charge I charged a number of acts by the accused, but he substituted the words "by talking with her about"(having alcoholic drinks) instead of certain charged words, namely, "by inviting her to have" (alcoholic drinks). The guilty plea was accepted (R. 23). The prosecution elected to attempt to prove that the accused was guilty of the words charged. The members were left with the option (as to Charge I) of either finding the accused guilty of the specification including the words charged or guilty of the excepted and substituted words.

At the outset of voir dire, the court members were informed of the accused's pleas, including the fact that the accused had entered a plea of guilty to Charge I by exceptions and

[Page 1 of Appendix II]

Appellate Ex XLVIII

substitutions, and due to the unusual nature of the matter to be litigated, namely, that all the elements of the charged offense had been met and that the members would be responsible with either finding the accused guilty of the precise wording charged or alternatively, guilty of the excepted and substituted words, a detailed explanation was provided to the members (R. 28,29) prior to initial voir dire questioning and again after challenges had been exercised (R. 66,67).

In responses under oath during voir dire, the court members all indicated that they had not formed or expressed an opinion as to the guilt or innocence of the accused (R. 31) and that no member was aware of any of the facts and circumstances that gave rise to the charges and specifications, nor had any member read or heard details of the case from any source, including staff meetings, news media, private discussions or otherwise (R. 36). In response to questions from the civilian defense counsel, the members further indicated that they did not recall hearing of the accused by reputation in any regard in the Air Force community nor had they heard anything about the base hospital's department of emergency medicine (where the accused practiced) in terms of reputation, positive or negative (R. 45).

Subsequent to the trial, a letter dated September 8, 1993 was received by the office of the Secretary of the Air Force. Its author, Michael Farrell, recounted comments he allegedly overheard in a restroom during the trial, comments he believed were made by two court members (App Ex XVII). After consulting with counsel, the Military Judge forwarded questionnaires to each court member to be executed under oath. The completed questionnaires (App Exs XXXIV-XXXIX) revealed that each member was absolutely certain that he never overheard nor participated in such a conversation, nor was he aware that this or a similar conversation occurred.

In a post-trial Article 39(a) session on 2 November 1993, Mr. Farrell initially testified that the conversation he overheard involved essentially the same words he used in his 8 September letter. Upon further examination, however, he added that the conversation also included derogatory comments concerning the prosecutor. As his testimony progressed, his description of the words used and their implications tended to change, mostly in minor ways. He was unable to identify the individuals involved, since he had not been able to see their faces clearly, but he was certain that both wore aviator wings and one also wore jump wings.

CONCLUSION. Findings of a court which are proper on their face may be impeached only when extraneous prejudicial information was improperly brought to the attention of a member, or outside influence or unlawful command influence was improperly brought to bear upon any member (R.C.M. 923). In the present case, there is no evidence of extraneous prejudicial information or outside influence, and the allegation of "unlawful command influence" is

[Page 2 of Appendix II]

tenuous even when viewed charitably. That this conversation between two court members in the words and form described by Mr. Farrell is exceedingly unlikely. If indeed he was persuaded at the time that the import of the conversation was that his close friend was going to be convicted on charges for which he deserved no more than a "slap on the wrist" due to the fact that "command" wanted a conviction, it seems highly unlikely that he would not have disclosed this disturbing information to the accused or counsel. He admitted that he performed a balancing of this conversation and its implications only after being shaken at the results of the trial.

Having observed his demeanor carefully during his testimony, the Military Judge is convinced of two things--first, that Mr. Farrell now sincerely believes that the conversation he describes occurred; and secondly, that the conversation was at the time and is now being filtered through the emotionally charged memory of an individual who has seen a close friend, of whose innocence he remains absolutely convinced, convicted of felony charges. I do not find the argument that Mr. Farrell has manufactured this incident to be credible; on the other hand, however, his interpretation of the conversation similarly lacks credibility.

Assuming arguendo that such a conversation occurred at all and that its principals were court members, the only thing that can be inferred from Mr. Farrell's variable description of the words used is that it contained two central themes: sexually demeaning comments about the female prosecutor and reference to Tailhook and the command interest that followed. However, derogatory descriptions of the prosecutor hardly support a conclusion that the same individuals would reward her with a conviction they otherwise believed to be unjust. The opposite seems more likely. Indeed, if they honestly believed the accused deserved nothing more than a slap on the wrist and were insulted by an aggressive prosecution of a fellow male officer by a female, ample opportunity would exist in the secrecy of deliberations to conclude, if they were so persuaded, that the threshold of guilt beyond a reasonable doubt had not been achieved.

Assuming further that some reference was made during the conversation to Tailhook and the command interest that has followed it, the connection to the present case is difficult to fathom. This was not a case where the central issue being litigated was sexual misconduct by the accused. The accused's plea of guilty (by exceptions and substitutions) to the offense of Conduct Unbecoming an Officer and a Gentleman under Article 133 had been accepted, and the members were so informed. The accused freely admitted his acts of misconduct during his direct testimony, and only challenged some comparatively minor wording in the specification because of its central importance to his theory that he was "set up" and not guilty of Charge II.

The prosecution's principal charge in this case, the only charge that was strenuously litigated, was that an Air Force physician

[Page 3 of Appendix II]

had distributed cocaine.  The defense theory was that the accused had been set up by a guilty paramour and her jealous husband.  By the time that the conversation described by Mr. Farrell allegedly occurred, the members had heard all the prosecution evidence and most of the defense evidence, including the testimony of the accused and his questioned document examiner witness.  In a military environment where antipathy to illegal drugs, particularly cocaine, is patently obvious, it strains credulity to believe that mature lieutenant colonels would be agreeing that an Air Force physician of field grade rank, accused of distribution of cocaine to a female patient married to an enlisted member in a billeting room on base where had appears to have entended to have sexual relations would have "gotten off with a slap on the wrist except for Tailhook and the command interest".  While some comments about Tailhook may have been made in this bathroom talk, they appear to have had no relationship to the case.

There is no evidence that any unlawful command influence, direct or indirect, was brought to bear upon the members in this case.  Under oath, the members indicated in voir dire that they had no knowledge of the facts of the case from any source, including private conversations, nor did they have any knowledge of the reputation of the accused or his emergency medicine clinic.  Further, if a bathroom conversation occurred between two of the members, it apparently held such little significance that none of the members now (including the participants) have any recollection at all of such an event.  Had members been exposed to command influence of the nature described by Mr. Farrell, this hardly seems likely.

RULING.  Having carefully considered all the evidence, I find that the findings and sentence of the court are proper on their face and that no basis pursuant to R.C.M 923 exists to impeach them based on extraneous prejudicial information, outside influence or unlawful command influence.

ROBERT E. SEARS, Colonel, USAFR
Military Judge

[Page 4 of Appendix II]